**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM J. BUECHELE, | ) | |
| | ) | |
| Plaintiff-Claimant, | ) | |
| | ) | No. 11 C 4348 |
| v. | ) | |
| | ) | Jeffrey T. Gilbert |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant-Respondent. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant William J. Buechele ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), in which the Commissioner denied Claimant's application for disability insurance benefits.[1] This matter is before the Court on the parties' cross-motions for summary judgment [Dkt.#18, 23]. Claimant argues that the Commissioner's decision denying his application for disability insurance benefits should be reversed and/or that the case should be remanded for further proceedings. Claimant raises the following issues in support of his motion: (1) whether the Administrative Law Judge ("ALJ") failed to follow the treating physician rule; (2) whether the ALJ failed to properly evaluate Claimant's credibility; and (3) whether the ALJ relied on flawed vocational expert testimony. For the reasons set forth below, Claimant's motion for summary judgment [Dkt.#18] is granted,

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, Carolyn W. Colvin is automatically substituted as the Defendant in this suit. No further action is necessary to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

and the Commissioner's motion [Dkt.#23] is denied. The decision of the Commissioner of Social Security is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

### A. Procedural History

Claimant filed an application for Social Security disability insurance benefits and supplemental security income on June 2, 2008, alleging a disability onset date of December 15, 2007. R.39-40. Claimant's date last insured was September 30, 2010.[2] R.131. The Social Security Administration ("SSA") denied his initial application on July 11, 2008. R.41-43. Claimant then filed a request for reconsideration on August 26, 2008, which was denied on September 30, 2008. R.64-70. Claimant filed a timely written request for a hearing on October 15, 2008. R.75. A hearing was held before the ALJ on August 28, 2009, at which both Claimant and Vocational Expert Leanne L. Kerr testified. R.9.

On October 27, 2009, the ALJ issued a decision denying the claims for benefits. R.44, 55. Claimant filed a timely request on November 11, 2009, for review of the ALJ's decision with the SSA's Appeals Council. R.116. On April 29, 2011, the Appeals Council denied his request for review, thus rendering the ALJ's decision a final administrative decision by the Commissioner. R.1. Claimant timely filed a complaint in this Court pursuant to 42 U.S.C. § 405(g).

---

[2] Because Social Security disability benefits under Title II equal insurance against lost income caused by disability, the applicant/worker must show a recent connection to the work force to maintain insured status. 42 U.S.C. § 423(c) and 20 C.F.R. § 404.130. This generally means the applicant was working in 20 of the last 40 quarters. For an applicant who is thirty-one years old or older, the "last date of insured status" generally is five years after his or her date of last work.

**B. Hearing Testimony – August 28, 2009**

**1. Claimant's Testimony**

At the time of the hearing, Claimant was fifty-one years old, married, and living with his wife and four children. R.14. At the hearing, Claimant testified that after serving three years in the Army, he worked for nine years as a border patrol agent in Yuma, Arizona, and then transferred to the U.S. Marshal's Service in Detroit, Michigan. R.16-17. Claimant stated that he was a deputy U.S. Marshal for six years but he left that job to help care for his children after his wife gave birth to twins, one of whom required constant care. R.17. Claimant testified that after a couple of years of unemployment during which he was responsible for child care, he and his wife purchased a business. *Id.* According to Claimant, this business went bankrupt, so he began working as a truck driver for other companies. *Id.*

Claimant testified that he stopped working his most recent truck driving job because the company he was driving for went out of business. R.18. Claimant then stated that while he was looking for other employment, he began experiencing lower back pain. *Id.* Claimant's Disability Report states that his last employer went out of business in mid-November 2007 and he became unable to work because of his back pain in mid-December 2007. R. 173. While Claimant stated that his back pain was not caused by a specific accident, he noted that he had been involved in numerous accidents in the past including two motorcycle accidents. R. 18. Claimant stated that he was placed in a medically induced coma and had his spinal cord stripped after one of those motorcycle accidents. *Id.*

Claimant testified that after seeking treatment for his back pain (in January 2008 according to his medical records), a doctor sent him to get an electromyogram ("EMG"). R.18-19, 29. According to Claimant, the EMG, which he had about a year before the hearing, revealed

that he had a pinched nerve in his lower spine. R.19. Claimant testified that there was nothing that physicians could do about his pinched nerve other than provide a pain management plan. R.19-20. Claimant clarified that he was told that surgery would have had a fifty percent chance of leaving him paralyzed. R. 20-21.

Claimant testified that every three months he saw Dr. Shah, his treating physician, and visited the University of Illinois pain clinic to have his medication plan monitored. R.21-22. Claimant further testified that his required medication doses increased over time. R.30. Claimant believed that his physicians increased these doses because his pain worsened and the medication became less effective. *Id.* Claimant stated that he attended five physical therapy sessions beginning in May or June of 2008 but stopped physical therapy because it made his condition worse. R.18. Claimant testified he was in bed in pain for two days after each physical therapy session. R.29. Claimant testified that he had no other health problems, and that if it was not for his back pain, he could have worked. R.20. But Claimant then went on to note that his back problem also caused hip, leg, and neck pain. R. 22.

Claimant stated that his medication helped make him feel a little bit better, but that the pain worsened during the day. R.24. According to Claimant, he had to rest "three to four to five times" per day in order to ease his pain. R.24, 30. Claimant clarified that he would take Vicodin and rest for an hour or two, hoping that he could sleep. R.26.

Claimant testified he was only able to do minor chores to help around the house, like fold the laundry, get his children out of bed, dress them, and pour milk for their cereal. R.25. Claimant stated that, besides pouring milk, he did not cook. *Id.* Claimant testified that he tried to help with vacuuming and yard work but could not perform these tasks. *Id.* Claimant further stated that his hobbies once included playing sports but that he was unable to do that anymore.

R.26. Claimant testified that at the time of the hearing his daily activities included watching television and trying to read newspapers. *Id.* According to Claimant, he was able to lift a gallon of milk or a twelve pack of soda from a table, but could not pick up anything from the floor. *Id.* Claimant stated that he was still involved in his children's activities, but could not always be a spectator at events. R.30-31. Claimant explained that walking from the parking lot to the school tired him, and he usually sat in the car to watch because bleachers and benches caused him significant pain. R.31

Claimant testified he was able to drive. R. 14. Claimant stated that if he stood for about five to ten minutes, his back pain would escalate and he would need something to lean on. R.29. Further, Claimant testified that any time he traveled more than a table's length he needed a cane. R.26. Claimant alleged that he could sit for about thirty minutes before having to move, and he could only walk a couple hundred feet. R. 27. Claimant further alleged that he could not walk a half block without stopping several times to let the pain dissipate or stopping to rest for at least thirty minutes. *Id.* Claimant described his pain while walking without medication as feeling like his hips were grinding and electricity was shooting up his back. *Id.* Claimant described his pain while walking after taking medication as feeling like he had constant muscle cramps that worsened as the distance walked increased. *Id.*

Claimant testified that his concentration had diminished, that he slept during the day for an hour or two due to exhaustion and his pain medication, and that he became constipated, drowsy and nauseated from his medication. R. 28. Claimant testified that during the hearing he had been fidgeting in his seat, and stood up once because his chair was uncomfortable. R.28-29.

## 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  The VE listed three jobs in her summary of Claimant's past relevant work: deputy U.S. Marshal, border patrol agent, and truck driver. R.33. The VE testified that, hypothetically, an individual who was approaching an advanced age, had a GED, had the same relevant work history as Claimant, was limited to light work, could only occasionally climb stairs, could not be exposed to dangerous machinery, and was unfit for work requiring focused or intense concentration for extended periods of time would not be able to satisfy the requirements of that individual's past work. *Id.*

When asked by the ALJ if this hypothetical individual could satisfy the requirements of other work, the VE stated that an individual "needs to be able to focus and maintain concentration as much as eighty-five percent of the work-day in order to sustain employment." R.34. The VE then clarified that if the individual could maintain focus at eighty-five percent, he would be able to do unskilled light work. *Id.* The VE also stated that if the individual could not maintain focus at eighty-five percent, he would not be able to do other work. *Id.* The VE testified that the most appropriate light work for the hypothetical individual described by the ALJ would exist in office helper, information clerk, or mail clerk positions. *Id.* The VE explained that these were light, unskilled, SVP 2 positions. *Id.*

The ALJ then asked whether a person who required a cane to ambulate would be precluded from any work or suffer any adverse impact on his ability to work. *Id.* The VE responded that the cane requirement would not have a significant impact unless the individual could not carry items like binders and folders while using the cane. *Id.* The ALJ then clarified that the individual would still have one free hand, and the VE responded that, if so, the type of light work under discussion could be performed by the individual, even with a cane. R.34-35.

The ALJ then asked the VE about a lumbar spine impairment questionnaire filled out by Claimant's treating physician, Dr. Shah. R.35, 387. The VE testified that this questionnaire indicated that, during an eight-hour day, Claimant was only capable of sitting for two to three hours and standing or walking for one to two hours. R.35. The VE explained that this requirement would prevent Claimant from performing any full-time work because he could not complete an eight-hour day. *Id.* The VE also testified that, based on the other information in the questionnaire, Claimant's maximum lifting abilities were sedentary. *Id.* The ALJ then asked the VE if the information in the questionnaire would have any other adverse impact. *Id.* The VE responded that this information would imply that Claimant had a sedentary residual functional capacity ("RFC"), which could preclude him from light work. *Id.* The VE testified that the hypothetical individual had no other skills that would transfer to other sedentary work. R.36.

Claimant's attorney then questioned the VE with regard to the ALJ's hypothetical scenario, asking whether additional requirements -- that the individual would need to alternate between sitting and standing positions every fifteen minutes and would need a cane for simply standing -- would have any further impact on the light jobs the VE mentioned. *Id.* The VE answered that alternating sitting and standing positions every fifteen minutes would prevent the hypothetical individual from performing at a mail clerk position, but would only reduce his functionality at an information clerk position by fifty percent. *Id.* The VE then clarified that the individual would only be functional as a mail clerk if he could still maintain daily focus at eighty-five percent. *Id.* Additionally, the VE noted that the mail clerk position would require use of the individual's dominant hand while standing with a cane *Id.*

Finally, the VE testified that an individual would be precluded from "all competitive employment at all levels" if he needed to rest for half an hour at least three times per day. *Id.*

## C. Medical Evidence

### 1. Silver Cross Hospital

Claimant first received medical treatment relating to his alleged disability on January 21, 2008, in the emergency department of Silver Cross Hospital in Joliet, Illinois. R.262. Claimant walked into the emergency department without assistance, complaining that he had been experiencing lower back spasms, as well as pain in his sacrum, flank, lower back, and hips for three days. R.264-266.

The Silver Cross physician ordered a lumbar spine x-ray and diagnosed Claimant with lumbago. R.265. Claimant had an x-ray and then was discharged with prescriptions for Flexeril, Motrin, and Vicodin. R.268. The January 21, 2008 lumbar spine x-ray indicated minimal degenerative changes of the lumbar spine and no radiographic evidence of an acute skeletal abnormality. R.269. On March 27, 2008, Claimant had an MRI that revealed "fullness of the nerve root sheath at L5-S1 on the left." R.276. The MRI report states that these "[f]indings [are] suspicious for left L5-S1 conjoined nerve root." (*Id.*) The report also says "[t]here is a mild diffuse disc bulge at L5-S1 with no significant spinal canal or neural foraminal stenosis. The remaining disc levels are within normal limits." (*Id.*)

On April 2, 2008, Claimant began a prescribed, twelve-session physical therapy program at Silver Cross's Physical Rehab & Performance Center. R.279. Claimant attended five of these sessions between April 2, 2008 and April 17, 2008. R.285. After the fifth session, Claimant did not wish to schedule any more appointments, so he was discharged. R.285. As noted earlier, Claimant testified that physical therapy made his condition worse. R.18, 29.

## 2.    Primary Care Joliet

On January 29, 2008 Claimant underwent an exam at Primary Care Joliet ("PCJ"). R.310. The staff at PCJ diagnosed Claimant with lumbago and prescribed him Ibuprofen and Cyclobenzaprine. R.311. Also on this date, Dr. Yatin M. Shah, Claimant's treating physician at PCJ, scheduled an EMG for February 28, 2008, noting that Claimant had back pain radiating to the buttocks. R.271. Dr. Bakul K. Panya, at Silver Cross Hospital, reviewed this EMG ordered by Dr. Shah and found that the EMG was abnormal, and that it indicated a mild chronic L4-5 radiculopathy with a mild early peripheral neuropathy. R.273. On March 19, 2008 Claimant had another exam at PCJ. R.308. The PCJ staff renewed Claimant's prescriptions for Tramadol and Acetaminophen and referred Claimant to the physical therapy department at Silver Cross. R.278, 309. On April 14, 2008, Claimant again was examined at PCJ. R.306. The PCJ staff maintained its diagnosis of lumbago and renewed Claimant's prescription for Tramadol. *Id.*

Claimant saw Dr. Shah at PCJ on January 6, March 11, April 6, July 1, and October 2, 2009. R.406-430. At each of these visits, Dr. Shah maintained his diagnosis of degeneration of Claimant's lumbar or lumbosacral intervertebral disc, and renewed Claimant's prescriptions. R.405-412.

On March 11, 2009, Dr. Shah completed a lumber spine impairment questionnaire. R.387. Dr. Shah noted his diagnosis as degenerative disc disease of the lumbar spine and lumbar radiculopathy. *Id.* Dr. Shah listed numerous clinical findings to support his diagnosis. He noted that Claimant had limited range of motion in the lumbar spine, muscle spasms, sensory loss in both lower extremities, and muscle weakness in both legs, and that Claimant performed positive straight leg raise tests of forty-five degrees in the left leg and fifty degrees in the right leg. R.387-888. Dr. Shah listed Claimant's symptoms as back pain with radiation to both legs. R.388. Dr.

Shah found these symptoms and limitations reasonably consistent with Claimant's physical and/or emotional impairments described in the evaluation. *Id.*

Dr. Shah then indicated that Claimant only could sit for two to three hours per day, and stand or walk one to two hours per day. *Id.* He also indicated that it would be necessary or medically recommended that Claimant walk around for fifteen to twenty minutes at work as needed. R.390. Dr. Shah stated that it would be necessary or medically recommended that Claimant not stand or walk continuously at work. *Id.*

Dr. Shah indicated that Claimant occasionally could lift or carry five to ten pounds but never more than ten. R.390. He listed Claimant's prescribed medications as Gabapentin, Amitriptyline, and Diclofenac. *Id.* Dr. Shah stated that Claimant was not a malingerer and that he could tolerate low work stress levels. R.391.

Dr. Shah indicated that Claimant would need to take unscheduled breaks at unpredictable intervals two to three times per day for fifteen to twenty minutes. R.392. Dr. Shah stated that Claimant's condition did not interfere with his ability to keep his neck in a constant position. *Id.* Dr. Shah indicated that Claimant would be likely to miss work more than three times a month because of his condition and that he would not recommend Claimant push, pull, kneel, bend, or stoop. *Id.*

On July 1, 2009, Dr. Shah completed a work excuse slip which said that Claimant could not return to work because of a degenerative disc disease of the lumbosacral spine. R.396, 407. On December 8, 2009, Dr. Shah indicated that Claimant was stable on his current medication and that Claimant would meet with the University of Illinois Pain Clinic in January of 2010. R.432.

### 3. Loyola Medicine

On May 14, 2008, Claimant, upon referral from Dr. Shah, saw Dr. Ninith Kartha, a neurologist at Loyola Medicine, for an MRI. R.321. Dr. Kartha's assessment was that Claimant "may have a mild L4-5 radiculaopathy per EMG report but does not warrant surgical management based on L-spine MRI findings." R. 323. Dr. Kartha also noted that Claimant's "[l]ow back pain and leg pain and paresthesias . . . is not c/w [consistent with] neurogenic claudication since L-spine essentially wnl [within normal limits]." *Id.* Dr. Kartha ordered follow-up MRIs of Claimant's cervical and thoracic spine. R.287, 323. On May 21, 2008, Claimant had the follow-up MRIs. R.289. The cervical spine MRI revealed multilevel degenerative changes combining with a congenitally narrow canal, causing mild to moderate spinal canal stenosis at C5-6 on the left and C6-7 on the right. *Id.* The thoracic spine MRI was unremarkable. *Id.*

Dr. Kartha's assessment of the second MRI set based upon the reported results was that there was "no evidence of myelopathy to explain [Claimant's] leg pain, paresthesias. He reports no cervical radicular symptoms despite degenerative changes in C-spine. His main complaint continues to be low back, hip joint pain which is likely musculosketetal in nature." R. 323. Dr. Kartha recommended Claimant be evaluated in a pain management clinic. *Id.*

### 4. University of Illinois Pain Clinic

The record reveals that Claimant saw Blanca Velez, a medical student, on August 13, 2008 for a pain service consultation at the University of Illinois pain clinic. R.340. Velez recommended Claimant begin Arthrotec and Gabapentin, refill his Vicodin prescription, have an x-ray taken of his sacroiliac joint, and return in one month to re-evaluate his pain management plan. R. 341. A September 10, 2008 report indicated that Claimant's sacroiliac joint x-rays

recommended by The University of Illinois Pain Clinic were also unremarkable. R. 381.  The record does not contain any other records from the pain clinic, although Claimant testified that he regularly sees Dr. Shah and went to the pain clinic for pain management.  R.21.

**5.    State Agency Residual Functional Capacity ("RFC") Capacity Assessment**

On July 20, 2008, Francis Vincent, M.D., completed an RFC assessment of Claimant. R.326-333. Dr. Vincent's report stated that there was no treating source statement on file regarding Claimant's physical capabilities. R.332.  On Claimant's RFC form, Dr. Vincent listed his primary diagnosis as "degenerative changes of the spine" and his secondary diagnosis as "mild L4-5 radiculopathy."  R.326. The external limitations section of Claimant's RFC form indicated that Claimant could occasionally lift or carry twenty pounds, frequently lift ten pounds, stand and/or walk with breaks for about six hours of an eight-hour workday, and sit about six hours in an eight-hour workday. R.327.  This section also indicated that Claimant's push and/or pull abilities were not limited by his disability. *Id.*

Dr. Vincent found the objective medical evidence from Claimant's May 27, 2008 appointment with Primary Care Joliet inconsistent with his prescription for a cane. R.328. Further, the physician found Claimant's alleged daily activities and symptoms inconsistent with the objective medical evidence. *Id.*  The postural limitations portion of Claimant's RFC form asserted that Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and could frequently stoop and crouch. *Id.* The physician found no manipulative, visual, communicative, or environmental limitations. *Id.*  He found the alleged level and persistence of Claimant's back pain inconsistent with the objective medical evidence and considered Claimant partially credible due to the mentioned inconsistencies.  R.333.

On September 29, 2008, Richard Bilinsky, M.D., another state agency reviewing physician, reviewed Dr. Vincent's July 10, 2008, RFC assessment and agreed with it. R.385.

## D. The ALJ's Decision – October 27, 2009

Following a hearing and a review of the medical evidence, the ALJ determined that, from December 15, 2007 through the date of his decision, Claimant was not under a disability as defined by the Social Security Act. R.44. The ALJ evaluated Claimant's application under the appropriate five-step sequential analysis. R.44-47. At step one, the ALJ found that Claimant had "not engaged in substantial gainful activity since December 15, 2007, the alleged [disability] onset date." R.46. At step two, the ALJ found that Claimant had severe impairments consisting of "discogenic disorders of the back." *Id.* Despite considering these discogenic back disorders "severe within the meaning of the Regulations," at step three, the ALJ found that Claimant's impairment or combination of impairments did not meet or medically equal one of the impairments listed in 20 CFR 404.1520(d), 404.1525, and 404.1526. *Id.*

Before proceeding to step four, the ALJ determined that Claimant had the RFC "to perform less than the full range of light work as defined in 20 CFR 404.1567(b)." *Id.* As part of his analysis, the ALJ noted that Claimant was "capable of occasionally climbing and negotiating stairs… [and] of performing work activity that would not require focused or intense concentration for extended periods [of time]." R.46-47. The ALJ further noted that Claimant "should avoid all exposure to hazardous or dangerous machinery." R.46.

The ALJ found that "Claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, [Claimant's] statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the above [RFC] assessment." R.47-48. The ALJ found that

Claimant's treatment was conservative and routine, consisting only of medication management and five physical therapy sessions. R.48. The ALJ stated that this was not the type of treatment that a totally disabled individual would be expected to receive. *Id.*

The ALJ further noted that Claimant's symptoms may not have been as severe as alleged because he stopped attending physical therapy after only five sessions. *Id.* Further, although Claimant was prescribed a cane, the ALJ noted that "the objective findings were essentially normal with minimal abnormalities." *Id.*

While examining the record regarding Claimant's treatment at the University of Illinois pain clinic, the ALJ noted that, beyond references in Dr. Shah's 2009 treatment notes, the record did not reveal any other treatment records from the pain clinic. R.51. The ALJ further noted that Dr. Shah's notes indicated that he was the one that continued to manage Claimant's medication. *Id.*

The ALJ wrote that he gave the State agency medical consultants' (Drs. Vincent and Bilinsky) physical assessments "appropriate weight" because he found them generally consistent with the medical evidence of record. *Id.* The ALJ also said that he disagreed with the consultants' findings regarding Claimant's limitations within the range of light work because the consultants did not adequately consider Claimant's subjective complaints. *Id.*

Although Dr. Shah opined on July 1, 2009, that Claimant was totally disabled and unable to return to work, the ALJ noted that Dr. Shah's statements classifying Claimant as "disabled" or "unable to work" are not medical opinions and those determinations are reserved to the Commissioner. R.52. Thus, he did not accord them controlling weight, though the ALJ said he recognized that Dr. Shah's opinions still must be carefully considered to determine the extent to which they are supported by the record as a whole. *Id.*

The ALJ went on to give Dr. Shah's March and July 2009 opinions little weight because he found they were inconsistent with the evidence of record (including Dr. Shah's own treatment notes and findings). *Id.* In deciding to give Dr. Shah's opinions little weight, the ALJ noted that Dr. Shah's July 2009 examination was essentially within normal limits except for notes that Claimant had a limited range of motion in the lumbar spine and a right-sided limp. *Id.* The ALJ found that these treatment notes failed to reveal the type of significant clinical and laboratory abnormalities and findings the ALJ would expect to see for a patient with a true disability. *Id.* The ALJ noted further that Dr. Shah's general course of treatment was inconsistent with a plan of treatment that would be expected for a truly disabled patient because Dr. Shah simply refilled Claimant's medication and instructed Claimant to return in three months. *Id.* Because the ALJ thought that Dr. Shah's opinions contrasted with the other evidence and were unsupported by Claimant's normal spine MRIs, he gave little weight to those opinions. *Id.*

The ALJ noted that even though Claimant stated that he last worked on November 11, 2007, after being laid off from his truck driving job, he did not become unable to work until December 15, 2007. *Id.* The ALJ believed that this indicated that Claimant stopped working because of the layoff and not because of his alleged disabling impairments. *Id.* Further, the ALJ noted that Claimant was not placed on any work restrictions by his doctor until 2009, indicating that Claimant's symptoms may not have been as severe as he alleged during the entire disability period. *Id.*

The ALJ also noted that the evidence was inconsistent with Claimant's alleged daily activities. *Id.* The ALJ found that two factors weighed against Claimant's description of his daily activities. *Id.* The first factor he noted was that Claimant's alleged daily activities could not be objectively verified. *Id.* The second factor the ALJ noted was that even if Claimant's limited

activities were taken as factual, it would be difficult to attribute the limitations to Claimant's medical condition and not to other reasons. *Id.* The ALJ concluded that Claimant's testimony about his alleged daily activity limitations were outweighed by these two factors. *Id.* Despite Claimant's reports of pain, the ALJ found that the medical evidence of record established that Claimant retained the capacity to perform work activity at the referenced RFC . *Id.*

At step four, after determining Claimant's RFC, the ALJ found that Claimant was unable to perform any past relevant work. *Id.* At step five, the ALJ found, considering Claimant's age, education, work experience, and residual functional capacity, that there were jobs that existed in significant numbers in the national economy that Claimant could have performed. R.54. In making his step five decision, The ALJ considered the VE's testimony and concluded that Claimant could perform light, unskilled jobs available in significant numbers in the national economy even if he needed a cane and needed to alternate sitting and standing positions every 15 minutes. R.55. Therefore, the ALJ concluded that Claimant was not disabled under the Social Security Act. *Id.*

## II. LEGAL STANDARD

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106–07, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ

applied the correct legal standards in reaching his decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support the findings. *Nelms,* 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.      Disability Standard**

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue,* 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected ... to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

**A.      The ALJ Failed to Follow the Treating Physician Rule**

A treating physician's opinion is entitled to controlling weight if it is supported by the medical findings and not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); Social Security Ruling ("SSR") 96-2p; *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).   An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician is not, by itself, sufficient for the ALJ to reject an examining physician's opinion.  *Gudgel,* 345 F.3d at 470.  Once well-supported contradictory evidence is introduced, however, the treating

physician's opinion is no longer controlling but remains a piece of evidence for the ALJ to weigh. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). When an ALJ fails to credit a treating physician's opinion, he must at least minimally discuss the reasons that lead him to that result. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2001).

In the instant case, Claimant argues that the ALJ failed to follow the treating physician rule and, instead, "played doctor" himself by substituting his opinion of the medical evidence for Dr. Shah's opinion as Claimant's treating physician. An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Rohan v. Chater*, 98 F.3d 966 at 968 ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); 20 C.F.R. § 404.1527(d)(2) ("We have likewise insisted that an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."). An ALJ also cannot disregard medical evidence simply because it is at odds with the ALJ's unqualified opinion. See *Murphy ex rel. Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007).

After a thorough review of the ALJ's decision and the record in this case, the Court concludes the ALJ failed to explain adequately his reasons for disregarding the opinion of Claimant's treating physician, Dr. Shah, and instead seems to have substituted his own view of the medical evidence for that of Dr. Shah without supporting that judgment with competent substantial evidence of record. Although the Court cannot and does not conclude on this record that Claimant is, in fact, disabled and entitled to benefits, it also cannot conclude that the ALJ's analysis of the evidence passes muster under the applicable legal standards. In a number of

respects discussed below, the Court concludes that the ALJ failed to build both an accurate and a logical bridge from the evidence that the ALJ references in the record and his ultimate conclusion. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011; *Berger v. Astrue,* 516 F.3d at 544.

### 1. Treating Physician vs. Consulting Physicians

In March 2009, Claimant's treating physician, Dr. Shah, filled out a lumbar spine impairment questionnaire in which he reported his diagnosis of Claimant as "degenerative disc disease of L-S spine; lumber radiculopathy." R.387. Dr. Shah opined that Claimant could sit for 2-3 hours in an 8-hour day and stand or walk for 1-2 hours during an 8-hour day. R.389. He said it was medically recommended that Claimant get up and move around as needed during the day and not sit again for 15-20 minutes. R.390. Dr. Shah also opined that Claimant would have to take unscheduled breaks 2-3 times a day for 15-20 minutes each. R.392. Dr. Shah further opined that Claimant "is unable to return to work at this time because of degenerative disk disease of L-S spine" and is "currently totally disabled." R.396. The VE testified that Dr. Shah's responses to this questionnaire indicated that Claimant was precluded from performing any full-time work because he could not complete an eight-hour work day. R. 35.

The ALJ gave Dr. Shah's opinions little weight. R.52. Instead, the ALJ seems to have preferred the opinions rendered by the agency consulting physicians, neither of whom examined Claimant, who opined that Claimant retained the ability to perform a restricted range of light work. The ALJ said he gave the consulting physicians' opinions "appropriate weight" because they were "generally consistent with the medical evidence of record" (R.51), though the ALJ also discounted the consulting physicians' opinions because "they did not adequately consider the claimant's subjective complaints." (*Id.*)

The "appropriate weight" formulation under these circumstances is unhelpful. The Court does not know what that means. Did the ALJ give the consulting physicians' views more weight than Dr. Shah's? If so, how much more weight did he give them, and why did he do so? The sense one gets from reading the entire opinion is that the ALJ did give the consulting physicians' views more weight than Dr. Shah's but the reasons the ALJ did so are not explained other than by the conclusory statement that the consultants' views were "generally consistent with the medical evidence of record." R.51. The consulting physicians, however, did not review all the medical evidence of record. Neither of the consultants who reviewed Claimant's medical records and tendered their opinions in July and September 2008, a year before the hearing in this case, had available to them Dr. Shah's notes from his examination or treatment of Claimant between January and July 2009 or his opinions issued in March and July 2009. R. 327-28, 333, 385. One of those consultants, Dr. Vincent, had none of Claimant's medical records after May 2008 (R.327-328) -- in other words, that doctor saw only four months of Claimant's medical records relevant to his claimed disability -- and it is not clear whether the other consultant, Dr. Bilinsky, reviewed anything that was not in the file reviewed by the first consultant (R.384-85). [3]

Claimant is thus correct in stating that "[n]o medical source who reviewed the entire medical record found that Mr. Buechele was less severely limited than described by Dr. Shah." Pl. Mem. In Support of Summary Judgment [Dkt.#19] at 8. *See Ivey v. Astrue*, 2012 WL 951481, at * 13 (N.D. Ind. 2012) (an ALJ's decision to give more weight to a reviewing state agency physician's opinion "cannot stand where it lacks evidentiary support and is based on an

---

[3] Claimant represents, without objection by the Commissioner, that neither of the consulting physicians is a neurologist. Dr. Vincent is a retired general practitioner and Dr. Bilinsky is a nephrologist. *See* Claimant's Memorandum In Support of Summary Judgment [Dkt.#19] at 8, n.16, and 9, n. 17.

inadequate review of [the claimant's] subsequent medical record"), citing *Staggs v. Astrue*, 781 F. Supp. 2d 790, 794-95 (S.D. Ind. 2001) (remanding with instructions to obtain and consider an updated medical opinion based on all of the evidence in the record where the ALJ relied upon the state agency physicians' opinions that did not take subsequent medical records into account and therefore were not based on the entire medical record); *Bellinghiere v. Astrue*, 2011 WL 4431023, at *8 * (N.D. Ill. 2011) (finding that the state agency physicians' "opinions relied upon by the ALJ to contradict the opinions of Claimant's treating physicians were not based on a complete review or an accurate summary of all the relevant medical evidence" and therefore remand was necessary).

In addition, as noted above, the ALJ then discounted the opinions of the consulting physicians in arriving at his RFC determination because the ALJ said those physicians "did not adequately consider the claimant's subjective complaints." R.51. But the ALJ himself discounted Claimant's subjective complaints saying Claimant was not credible in reporting the limiting effects of his pain (R.47-48, 53) and he discounted Claimant's description of the degree to which his symptoms limited his daily activities (R.53). So, if the ALJ discounted Claimant's credibility because he was suspicious of Claimant's subjective reports of his symptoms, and he discounted the consulting physicians' opinions because they did not give Claimant's subjective complaints enough credence, the Court again is left guessing how much weight within the "appropriate weight" formulation the ALJ actually gave to the consulting physicians' opinions, and why those opinions were sufficient to outweigh the opinion of Claimant's treating physician, Dr. Shah.

Overall, it appears that the ALJ neither accepted fully Dr. Shah's opinions nor did he credit fully the consulting physicians' opinions. This makes it more likely than not that Claimant

is correct -- because the ALJ did not have available to him an opinion from a physician who had reviewed all of the medical evidence, including Dr. Shah's medical treatment records and opinions in 2009, the ALJ "played doctor" himself in reviewing and evaluating the medical evidence in the course of finding that Claimant was not disabled. Accordingly, without more explicit guidance from the ALJ in his written decision, we cannot say that he properly discounted Dr. Shah's opinion as Claimant's treating physician in favor of the opinions of the consulting physicians.

### 2.    Inconsistencies Between the Record Evidence and Dr. Shah's Opinion

In the two and one-half pages of his seven-page brief in which the Commissioner attempts to defend the ALJ's decision, the Commissioner does not address directly Claimant's arguments that the ALJ improperly rejected Dr. Shah's opinions in favor of the consulting physicians' opinions based upon their review of an incomplete medical record or that the ALJ improperly substituted his view of the medical evidence for that of Claimant's treating physician. The only thing the Commissioner says in this regard is that the ALJ properly noted that the consulting physicians' opinions supported his own. [Dkt#25] at 5. As discussed above, however, that begs the question in the context of this case. Instead, the Commissioner primarily argues that Dr. Shah's opinion was inconsistent with the record evidence and the ALJ's decision should be upheld for that reason.

The only specific inconsistency the Commissioner cites, however, is not something upon which the ALJ relies in his decision. The Commissioner points to an inconsistency between Dr. Shah's statement in his March 11, 2009, lumbar spine impairment questionnaire (R.386-393) and his progress notes in January, April and July 2009 when he examined Claimant, before and after he filled out the lumber spine questionnaire (R.407, 409, 412). [Dkt#25] at 5. The

Commissioner argues that Dr. Shah referenced clinical findings in the questionnaire, such as muscle spasm, sensory loss and muscle weakness, that are not specified in his progress notes. But the ALJ does not cite these supposed inconsistencies as support for his decision to reject Dr. Shah's opinion. Therefore, neither the Commissioner nor this Court can rely upon them to uphold the ALJ's decision. As the Seventh Circuit has cautioned, the Commissioner cannot succeed in defending an ALJ's decision on the basis of findings the ALJ does not make himself or herself. *Spiva v. Astrue,* 628 F.3d 346, 348 (7th Cir. 2010). Moreover, Claimant counters that Dr Shah's treatment notes actually do reference Claimant's muscle spasms (R.265, 411) so that there is no inconsistency in this regard between Dr. Shah's responses to the lumbar spine questionnaire and his treatment notes.

The ALJ himself does say that "Dr. Shah's opinion contrasts sharply with, and is without substantial support from, the other evidence of record, which renders it less persuasive." R.52. But the evidence the ALJ cites to support that conclusion is not necessarily inconsistent with Dr. Shah's opinion. For example, the ALJ says that on the same date (July 1, 2009) that Dr. Shah opined that Claimant was "totally disabled" and could not return to work because of his "[d]egenerative disk disease of L-S spine" (R.395-96), his progress notes show that "claimant was in no distress, had limited range of motion of the lumbar spine, and a right sided limp [sic] but his examination was otherwise essentially within normal limits." R. 52.[4] The ALJ characterized Dr. Shah's clinical findings as noting "only minimal abnormalities" that do not support a finding that Claimant is totally disabled. *Id.* The ALJ's own conclusion as to the

---

[4] The ALJ misspoke here. Dr. Shah actually noted Claimant "has a left-sided limp" in his examination records. R. 407, 409, 412.

import of Dr. Shah's treatment notes and their supposed inconsistency with his opinion is based upon a selective reading of the record.

Dr. Shah's progress note for July 1, 2009 reports his "constitutional" findings that Claimant is a "well-nourished, well-developed, well-groomed patient in no distress." R. 407. Later in his progress note, however, Dr. Shah reports, in bold letters, that Claimant "has a **left-sided limp** [and] [t]he lumbar spine has **limited ROM.**" *Id. (emphasis original.)* Dr. Shah also noted in his progress note Claimant's subjective complaints of chronic, severe low back pain, with limited range of motion, muscle stiffness, numbness and tingling, muscle spasm and sciatica. R. 406, 408, 411. Dr. Shah's constitutional assessment that Claimant is a "well-groomed patient in no distress" thus needs to be read in context of Dr. Shah's report of his objective findings that Claimant has a left-sided limp and limited range of motion, and Claimant's subjective reports of muscle stiffness, numbness, tingling, muscle spasm and sciatica. Whether the "abnormalities" identified by Dr. Shah are "minimal" in a person who presents with "[d]egenerative disk disease of L-S spine; lumbar radiculopathy" (R.387) is primarily a medical judgment, not something for a layman to determine.

The ALJ also discredits Dr. Shah's opinions because he says they "are not supported by the evidence of normal MRIs of the [Claimant's] spine." R.52. In support of that statement, the ALJ cites the results of an MRI of Claimant's spine in March 2008 at Silver Cross Hospital (R.276) and MRIs of Claimant's lumber, cervical and thoracic spine ordered and reviewed by Dr. Kartha at Primary Care Joliet in May 2008 (R.288-89, 323). The report of the March 2008 MRI states "[t]here is fullness of the nerve root sheath at L5-S1 on the left. This may represent a conjoined left L5-S1 nerve root . . . There is a mild diffuse disc bulge at L5-S1 with no significant spinal canal or neural foraminal stenosis. The remaining disc levels are within normal

limits." (R.276). The report concludes "[f]indings suspicious for left L5-S1 conjoined nerve root." *Id.* At the risk of stating the obvious, the negative inference from the statement that "the *remaining* disc levels are within normal limits" (R.276, emphasis added) is that the *other* MRI findings noted at L5-S1 are not within normal limits. Further, whether or not a "conjoined nerve root" or a "mild diffuse disc bulge" can or should be characterized as "normal" is a medical judgment, not something the ALJ is qualified to assess in the first instance. Therefore, the ALJ's conclusion that the March 2008 MRI was "normal" is not supported by the evidence.

Dr. Kartha's notes of his review of an MRI of Claimant's lumber spine in May 2008 do say "[n]o significant stenosis" and "L-spine essentially wnl [within normal limits]." R.323. The notes also go on to say, however, that "[Claimant] may have a mild L4-5 radiculopathy per EMG Report . . . ." *Id.* The EMG Report Dr. Kartha referenced is from March 2008. It says that Claimant's lumber spine "is abnormal and shows mild chronic L4-5 radiculopathy." R.273. Dr. Dr. Shah's diagnosis of Claimant, after having reviewed all of these reports, was "degenerative disc disease of L-S spine; lumbar radiculopathy." R.387.

After he reviewed the results of the MRI of Claimant's lumbar spine, Dr. Kartha ordered an MRI of his cervical and thoracic spine. Dr. Kartha's notes of his review of those MRI results report "multilevel degenerative changes are combining with a congenitally narrow canal to cause mild to moderate spinal canal stenosis at C5-6 on the left and C6-7 on the right." R.298. Dr. Kartha characterized the MRI of Claimant's thoracic spine as "normal." *Id.* Dr. Shah's diagnosis and opinion was lumber radiculopathy, however, not thoracic or cervical radiculopathy, so a "normal" MRI of Claimant's thoracic spine is not particularly relevant to what Dr. Shah was treating.

The medical evidence the ALJ cites for his conclusion that Dr. Shah's opinion is not supported by the "normal" MRIs of Claimant's spine thus does not clearly support that conclusion. Although the Court recognizes that the ALJ is entitled to deference on review of his decision, such deference does not extend to his "playing doctor." To the extent that the ALJ was qualified to assess whether Claimant's MRIs or his EMG were or were not "normal," it is not clear why his judgment in that regard should supplant Dr. Shah's medical judgment as Claimant's treating physician. The bottom line is that the Court cannot say that Dr. Kartha's statement that Claimant "may have a mild L4-5 radiculopathy" (*id.*) or Silver Cross Hospital's "findings suspicious for left L5-S1 conjoined nerve root" (R.276) are indications of "normal MRIs of [the] Claimant's spine" (R.52) that are fundamentally inconsistent with Dr. Shah's diagnosis of "degenerative disc disease of L-S spine; lumbar radiculopathy" (R.387). Without more explanation from the ALJ, or the opinion of a physician who had reviewed all of Claimant's medical records, the Court also does not see how the ALJ was in a position to make that judgment.

Finally, two other reasons cited by the ALJ as support for his decision to reject Dr. Shah's opinion also do not withstand analysis. The ALJ drew a strong negative inference against Claimant because Dr. Shah's medical opinion on July 1, 2009, that Claimant was "totally disabled" and could not return to work (R.396), was obtained by Claimant to support his application for disability benefits. R.52. But a negative inference against Claimant based upon this fact is patently unjustified. *Punzio v. Astrue*, 630 F.3d 704, 712-13 (7th Cir. 2011) ("How else can [claimant] carry this burden other than by asking her doctor to weigh in?"). The Commissioner concedes this was error by the ALJ but argues it is harmless. We cannot say it is harmless under the circumstances. The ALJ pulled together a laundry list of reasons to reject Dr.

Shah's opinion as Claimant's treating physician.  As discussed in this Opinion, a number of the reasons cited by the ALJ do not withstand analysis, at least without more explanation from the ALJ.  We cannot tell which of those reasons were more persuasive to the ALJ than others and, therefore, cannot say that the ALJ's decision to hold against Claimant the fact that Dr. Shah's opinion was solicited to support his claim for disability benefits was harmless.

In addition, while it is true, as the ALJ says, that Claimant was prescribed twelve sessions of physical therapy but only attended five sessions, the ALJ did not consider Claimant's explanation for discontinuing physical therapy.  Claimant testified that the physical therapy sessions did not help him and he was in terrible pain for days after each session.  R.18, 29.  It is not clear what additional benefit Claimant would have received had he continued with physical therapy.  The negative inference the ALJ draws from these facts thus is unjustified.

In conclusion, the clear sense the Court gets from reviewing the entire record and the ALJ's decision is that the ALJ substituted his layman's view of the medical evidence in place of that of Claimant's treating physician without clearly articulating how the medical evidence fails to support the treating physician's opinion.  The ALJ could have, and in the Court's view should have, solicited an updated opinion from an independent medical expert who would have had the opportunity to review all of Claimant's medical records and Dr. Shah's opinions before subjecting the record evidence to his own review.  Having not done so, however, the ALJ's decision comes to this Court on a weaker and ultimately inadequate footing.

To the extent that the ALJ meant to rest his decision on facts showing that Dr. Shah's opinions were inconsistent with objective medical evidence in the record, he needed to specify the evidence he relied upon to support that decision in more than a conclusory way.  Statements like "the general course of treatment pursued by Dr. Shah has not been consistent with what one

would expect to see if claimant were truly disabled" (R.52) do not satisfy the requirement that the ALJ build an accurate and logical bridge to support his decision in the context of this particular case. As discussed above, the little specific evidence the ALJ does cite as being inconsistent with Dr. Shah's opinion and diagnosis does not support his conclusion as a factual matter. Since no treating or consulting physician evaluated all of the record evidence and reached a different diagnosis or assessment than did Dr. Shah, and since the ALJ points to no other solid contradictory evidence or authority to discredit Dr. Shah's opinion, the Court is left with the conclusion that the ALJ impermissibly stepped over the line and "played doctor" here in a way that cannot withstand analysis under the applicable legal standard.

**B.      On Remand, the ALJ Should Revisit the Issue of Claimant's Credibility**

An ALJ is in the best position to determine the credibility of witnesses, and this Court reviews that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)). The ALJ has the discretion to discount testimony on the basis of evidence in the record. *Johnson v. Barnhart*, 449 F.3d 431, 435-36 (7th Cir. 2000). However, the basis for the ALJ's credibility determination must be articulated and "sufficiently specific" to make clear to a claimant and subsequent reviewers the weight given to a claimant's statements and the reasons for the weight given. SSR 96-7p. The ALJ must consider the entire case record in determining credibility, and statements about the intensity or persistence of symptoms or about the effect of symptoms on functioning may not be rejected simply because they are not substantiated by objective medical evidence. *Id.*

Here, the ALJ found Claimant's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not credible to the extent they [were] inconsistent with the above residual functional capacity assessment." R.47-48. Such language has been deemed

"meaningless boilerplate" and criticized for providing "no clue" as to the weight the ALJ gave a claimant's testimony. *Martinez et. al. v. Astrue*, 597 F.3d 920, 92 (7th Cir. 2010) ("It is not only boilerplate; it is meaningless boilerplate. The statement by a trier of fact that a witness' testimony is "not entirely" credible yields no clue as to what weight the trier of fact gave the testimony."; *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006) (indicating that a partially credible determination that the person is credible, but not to the extent alleged, is an odd finding and unclear in meaning). *See also Bjornson v. Astrue*, 2012 WL 280736 (7th Cir. Jan. 31, 2012).

Further, the ALJ never explained which of Claimant's alleged limitations he found incredible, or why he found those limitations incredible. Instead, the ALJ found that Claimant's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty." R.53. A claimant's statements about his own limitations, however, are naturally subjective, hence the need for the ALJ to make a credibility determination. The ALJ went on to say "even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision." *Id.* The ALJ cites no evidence showing that Claimant's limitations could have been attributed to something other than his medical condition. His belief that Claimant's activities are limited for some other reason is thus speculative, at best. Although it is clear here that the ALJ did not believe Claimant is disabled, he must do more to support his finding that Claimant is not telling the truth. *See* SSR 96-7p ("The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.") If the ALJ believed that the medical evidence did not support Claimant's allegations, he was required to

point to specific inconsistencies. *Zurawski v. Halter*, 245 F.3d 881,887 (citing *Clifford*, 227 F.3d at 870-72).

In the same vein, the ALJ discounted Claimant's credibility because he received only conservative treatment for his conditions. R.53. But there is no evidence that more aggressive treatment was indicated for Claimant's condition. Similarly, the ALJ noted that Claimant did not complete his prescribed physical therapy regimen. *Id.* Claimant stated, however, that physical therapy was not improving his condition and, in fact, was causing him more pain, so he discontinued the therapy. R.18, 29.

The ALJ also discounted Claimant's credibility because he stopped working in November 2007 as a result of a business-related lay-off, not because of a disabling condition. R.53. Claimant says he did not become unable to work until mid-December 2007 due to the pain in his back. *Id.* But Claimant does not claim that his back pain caused him to stop working. To like effect is the ALJ's conclusion that Claimant's symptoms are not as severe as alleged because his doctor did not place him on any work restrictions before July 2009. *Id.* Again, this is a make-weight argument. Since Claimant has not worked since November 2007, there was no need for Dr. Shah to place him on any work restrictions. Claimant submitted Dr. Shah's "work excuse" form in 2009 in connection with his application for disability benefits presumably to establish that he could not work. It is a bit unfair to use that against Claimant as if he should have sought such an opinion from his doctor when he had no job and thus no use for it in that context.

While we refrain from holding that the ALJ's credibility determination here was "patently wrong," we do believe that on remand further elaboration is necessary. The Seventh Circuit's language in *Zurawski v. Halter,* 245 F.3d 881, 888 (7th Cir. 2001) is equally applicable here: "Because the ALJ's decision, in its present form, falls below the mark, we lack a sufficient basis

to sustain the ALJ's credibility determination.  We are not suggesting that the ALJ's credibility determination was incorrect, but only that greater elaboration is necessary."

**C.      On Remand, the ALJ Should Revisit His Reliance on Vocational Expert Testimony**

As discussed above, the ALJ impermissibly supplanted Dr. Shah's opinions with his own and he did not sufficiently support his credibility determination. Therefore, the ALJ's determination of Claimant's RFC and his hypothetical to the vocational expert were naturally flawed.  In such a situation, when the ALJ's hypothetical to the VE is based upon an insufficient RFC, the case must be remanded to the SSA for further proceedings. *Young v. Barnhart,* 362 F.3d 995, 1004–05 (7th Cir. 2004).

Here, the ALJ's hypotheticals to the VE excluded limitations described in Claimant's testimony, and disregarded limitations referenced by Dr. Shah in his opinion. Specifically, because the ALJ did not find Claimant credible, he did not include in his hypothetical the requirement that Claimant rest at least three times per day for half an hour at a time because of his pain medications. The vocational expert testified that Claimant would be precluded from all light work if this was a requirement. Further, while the ALJ referred the vocational expert to Dr. Shah's opinions on the lumbar spine impairment questionnaire, he disregarded the limitations that Claimant only sit two to three hours per day and stand/walk only one to two hours per day. Because Claimant would only be able to work five hours per day maximum based on these limitations, the vocational expert stated that Claimant would be precluded from all full time work.  Because we find the ALJ improperly rejected Dr. Shah's opinion and insufficiently explained his credibility determination, we find that he improperly developed his RFC assessment. In light of that conclusion, the hypothetical examples posed to the vocational expert

based on the ALJ's RFC finding also must be reconsidered in light of any new findings made on remand.

Accordingly, for the reasons discussed above, Claimant's motion for summary judgment [Dkt.#18] is granted, and the Commissioner's motion [Dkt.#23] is denied. The decision of the Commissioner of Social Security is reversed and the case is remanded for further proceedings consistent with this Opinion and Order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated: March 25, 2013